MSM
F.#2016R00064

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF (1) THE WHITE AND BRONZE COLORED BLU CELL PHONE, MODEL ADVANCE 4.0 L2 WITH SERIAL NUMBER 5100016016001939 (THE "NIMMONS 1899 PHONE"); (2) THE SAMSUNG MODEL SM-B311V CELLULAR TELEPHONE WITH MEID HEX A00000476C0676 (THE "0676 SAMSUNG"); AND (3) THE SAMSUNG MODEL SM-B311V CELLULAR TELEPHONE WITH MEID HEX A00000476C09AC (THE "09AC SAMSUNG"), CURRENTLY IN THE CUSTODY OF THE ATF WITHIN THE EASTERN DISTRICT OF NEW YORK | APPLICATION FOR A SEARCH WARRANT FOR ELECTRONIC DEVICES<br><br>Case No.  19 M 293 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, BRITTANY RAFFA, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—three

electronic devices—that are currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and

Explosives ("ATF"), and have been since September 2015.  I am responsible for conducting

and assisting in investigations into the activities of individuals and criminal groups responsible for narcotics trafficking, robberies, possession of firearms, and firearms trafficking. These investigations are conducted both in an undercover capacity and overt capacity. I have participated in investigations involving search warrants, arrest warrants and court-authorized interceptions of wire and electronic communications.

3.      I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other law enforcement agents; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another agent or law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Transcriptions of recorded conversations are set forth in substance and in part, and are in draft form and subject to revision.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.      The property to be searched is set forth in the following paragraphs:

2

a.  White and bronze colored BLU cell phone, Model Advance 4.0 L2 with serial number 5100016016001939 (the "NIMMONS 1899 PHONE");

b.  Samsung Model SM-B311V cellular telephone with MEID HEX A00000476C0676 (the "0676 SAMSUNG"); and

c.  Samsung Model SM-B311V cellular telephone with MEID HEX A00000476C09AC (the "09AC SAMSUNG");

6.  The NIMMONS 1899 PHONE, the 0676 SAMSUNG and the 09AC SAMSUNG are collectively referred to herein as the "SUBJECT TELEPHONES."

7.  The SUBJECT TELEPHONES are currently located in the lawful custody of the ATF within the Eastern District of New York.

8.  The applied-for warrant would authorize the forensic examination of the SUBJECT TELEPHONES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.  I make this affidavit in support of an application to search the three cellular telephones described in paragraph 5, all of which were seized in connection with the February 26, 2017 arrests further described below.

I.  Prior Arrests and Indictments

10.  On February 26 and 27, 2017, based in part on communications intercepted pursuant to court-authorized wiretaps, law enforcement officers arrested MICHAEL HEWITT, PAUL MITCHELL, BONZELEE NIMMONS, CHANNEL GROOM and STEVEN SEAFORTH for conspiring to possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 846.

3

11.     In connection with the February 26 and 27, 2017 arrests, law enforcement officers recovered, among other things, a bag of more than 290 yellow pills containing methamphetamine, and nine cellular telephones.

12.     On March 28, 2017, the grand jury returned an indictment charging, among other things, HEWITT, MITCHELL, NIMMONS, GROOM and SEAFORTH with conspiracy to distribute methamphetamine in violation of Title 21, United States Code, Section 846. On March 14, 2019, the grand jury returned a third superseding indictment charging, among other things, HEWITT and NIMMONS with conspiring to distribute one or more controlled substances, including 50 grams or more of a mixture or substance containing methamphetamine, and possessing methamphetamine with intent to distribute, based on the pills seized during the February 26, 2017 arrest. (See 17 CR 164 (ENV)). To date, MITCHELL, NIMMONS and SEAFORTH have pleaded guilty to that charge. GROOM pleaded guilty to money laundering. HEWITT's trial is scheduled to begin on April 15, 2019.

II.     Prior Search Warrants

13.     On May 18, 2017, the Honorable Viktor V. Pohorelsky, United States Magistrate Judge, Eastern District of New York issued a warrant authorizing the search of five cellular telephones seized in connection with the February 26, 2017 arrests (the "May 18, 2017 Warrant"). (See 17 M 460.) The May 18, 2017 Warrant was based on the May 18, 2017 affidavit of ATF Special Agent Edward Martin (the "May 18, 2017 Affidavit"). The May 18, 2017 Warrant and the May 18, 2017 Affidavit are incorporated herein by reference and attached as Attachment C.

4

14.     On February 19, 2019, the Honorable Peggy Kuo, United States Magistrate Judge, Eastern District of New York, issued a warrant (the "February 19, 2019 Warrant") authorizing the search of certain of the five cellular telephones authorized to be searched by the May 18, 2017 Warrant, that were unable to be searched at that time because of technical limitations.

15.     As set forth in the May 18, 2017 Affidavit, HEWITT, NIMMONS, SEAFORTH and MITCHELL used cellular telephones to arrange a methamphetamine transaction at which they ultimately were arrested on February 26, 2017. The arrests, which occurred after 9:00 p.m., happened on the Castle Hill Avenue overpass of the Bruckner Expressway in the Bronx. HEWITT drove to the transaction in a gray Hyundai Sonata (the "Gray Sonata"). Chanel Groom was also in the Gray Sonata. NIMMONS drove himself and MITCHELL to the transaction in a red Ford Escape (the "Red Ford").

III.    Facts Regarding the Use of Other Cell Phones to Arrange the February 26, 2017 Transaction

16.     HEWITT and SEAFORTH initially communicated using telephone numbers 716-370-5962 and 347-898-2284, respectively. SEAFORTH and NIMMONS initially communicated using telephone numbers 347-898-2284 and 347-552-9091, respectively. However, the linesheets for the wiretaps on telephone numbers 347-898-2284 (used by SEAFORTH) and 347-552-9091 (used by NIMMONS), do not reveal (i) any communications between SEAFORTH and HEWITT using telephone numbers 347-898-2284 and 716-370-5962 after approximately 6:25 p.m.; (ii) any communications between SEAFORTH and NIMMONS, using telephone numbers 347-898-2284 and 347-552-9091, after approximately 7:00 p.m.; or (iii) any direct communications between HEWITT, using telephone number 716-370-5962, and NIMMONS,

using telephone number 347-552-9091, at any time on February 26, 2017, the day of the

transaction.   The linesheets, therefore, do not reveal any communications regarding the final

arrangements for the transaction at which HEWITT, NIMMONS, MITCHELL and GROOM

were arrested over those telephone numbers, including communications about where HEWITT

should meet NIMMONS, between approximately 7:00 p.m. and after 9:00 p.m., when the arrests

occurred.

      17.     Based on my training and experience and my participation in this investigation, I

believe that NIMMONS and HEWITT communicated to finalize the details of the transaction

using different cellular telephones that were assigned different cellular telephone numbers than

the ones set forth above, and that the SUBJECT TELEPHONES were used for those

communications.   This belief is supported by the following:

          a.   On February 26, 2017 at approximately 10:36 a.m., NIMMONS received the

             following text messages on telephone number 347-552-9091 from the user of

             telephone number 347-743-3227:  (i) Yo grammie wants your number;" (ii)

             "Should I give it to him?;" and (iii) "???".  Between approximately 10:37 a.m.

             and approximately 10:38 a.m., telephone number 347-552-9091 responded, "This

             Brenda he in the shower I'll ask him" and "He said ok give him this number

             9172251899."  Based on my training and experience, I believe that in this

             message, a third party was asking NIMMONS for a number at which HEWITT,

who the investigation has revealed goes by the nickname "Grammie,"[1] could

reach NIMMONS, to discuss the anticipated drug transaction directly.

b. At the time the officers arrested NIMMONS, they recovered the NIMMONS 1899
PHONE from the center console cup holder of the Red Ford Escape that
NIMMONS had driven to the scene of the drug deal. A law enforcement officer
called telephone number 917-225-1899, i.e., the number sent to the individual
asking for NIMMONS's telephone number on behalf of "Grammie," and the
NIMMONS 1899 PHONE rang.

c. The 0676 SAMSUNG and the 09AC SAMSUNG were recovered from the center
console of the gray Hyundai Sonata that HEWITT drove to the drug deal.

d. Communications intercepted pursuant to court order indicate that both
NIMMONS and HEWITT use more than one telephone in connection with their
drug dealing. For example, at approximately 8:04 p.m., MITCHELL called
NIMMONS on telephone number 347-552-9091 and asked, in substance, where
NIMMONS was. NIMMONS responded, "I'm calling my other boy now. I'm
waiting for his response. . . Yeah, alright, let me, uhm, let me, let me call him
because it's like my other boy is about to jump on the Bruckner right now."
Based on my training and experience, the evidence collected during the
investigation and the context of the conversation, I believe that NIMMONS was
telling his supplier, MITCHELL, that NIMMONS was going to be

---

[1] For example, a search, pursuant to a search warrant, of the cellular telephone recovered from the vicinity of
HEWITT and assigned telephone number 716-370-5962, which contains numerous pictures of HEWITT, revealed
that a facebook account called "Grammie M. Hewitt" that was loaded onto the phone.

communicating with HEWITT to arrange the drug deal.  As set forth above, the
linesheets do not show communications between NIMMONS's 347-552-9091
telephone number and HEWITT's 716-370-5962 telephone number.

18.     Based on my training and experience and the evidence collected during this
investigation, I know that individuals involved in joint criminal activity, such as a drug
conspiracy, frequently communicate with each other using cellular telephones through voice
calls, text messages, and other software applications that allow transmission of messages.  Based
upon my training and experience, I also know that members of narcotics conspiracies often save,
in their wireless devices or external storage media, such as flash drives or SD cards, contact
information and information regarding the expected delivery of the narcotics and sometimes use
their personal phones – either by accident or as a matter of convenience – to contact their
criminal confederates.  Based upon my training and experience, I also know that members of
narcotics conspiracies frequently have more than one cellular telephone that they use in
furtherance of their drug dealing activity in order to avoid law enforcement scrutiny or
compartmentalize aspects of their organization.

19.     The SUBJECT TELEPHONES are currently in the lawful possession of the ATF.
Therefore, while the ATF might already have all necessary authority to examine the SUBJECT
TELEPHONES, I seek this additional warrant out of an abundance of caution to be certain that
an examination of the SUBJECT TELEPHONES will comply with the Fourth Amendment and
other applicable laws.

20.     In my training and experience, I know that the SUBJECT TELEPHONES have
been stored in a manner in which their contents are, to the extent material to this investigation, in

substantially the same state as they were when the SUBJECT TELEPHONES first came into the possession of the ATF.

## **TECHNICAL TERMS**

21.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.
Images can usually be retrieved by connecting the camera to a computer or by
connecting the removable storage medium to a separate reader.  Removable
storage media include various types of flash memory cards or miniature hard
drives.  Most digital cameras also include a screen for viewing the stored images.
This storage media can contain any digital data, including data unrelated to
photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a
handheld digital storage device designed primarily to store and play audio, video,
or photographic files.  However, a portable media player can also store other
digital data.  Some portable media players can use removable storage media.
Removable storage media include various types of flash memory cards or
miniature hard drives.  This removable storage media can also store any digital
data.  Depending on the model, a portable media player may have the ability to
store very large amounts of electronic data and may offer additional features such
as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some
GPS navigation devices can give a user driving or walking directions to another
location.  These devices can contain records of the addresses or locations involved
in such navigation.  The Global Positioning System (generally abbreviated
"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

10

contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

22.  Based on my training, experience, and research, I know that the SUBJECT TELEPHONES probably have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

12

24. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each of the SUBJECT TELEPHONES was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on each of the SUBJECT TELEPHONES because:

    h. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    i. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    j. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    k. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

13

information necessary to understand other evidence also falls within the scope of the warrant.

l.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

26.   *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the SUBJECT TELEPHONES described in Attachment A to seek

the items described in Attachment B.

Respectfully submitted,

BRITTANY RAFFA
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me
on April 1, 2019:

HON. ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

The property to be searched is (1) THE WHITE AND BRONZE COLORED BLU CELL PHONE, MODEL ADVANCE 4.0 L2 WITH SERIAL NUMBER 5100016016001939 (THE "NIMMONS 1899 PHONE"); (2) THE SAMSUNG MODEL SM-B311V CELLULAR TELEPHONE WITH MEID HEX A00000476C0676 (THE "0676 SAMSUNG"); AND (3) THE SAMSUNG MODEL SM-B311V CELLULAR TELEPHONE WITH MEID HEX A00000476C09AC (THE "09AC SAMSUNG") (the "SUBJECT TELEPHONES").

The SUBJECT TELEPHONES are currently located in the custody of the ATF within the Eastern District of New York.

This warrant authorizes the forensic examination of the SUBJECT TELEPHONES for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

All records on the SUBJECT TELEPHONES described in Attachment A that relate to violations of 21 U.S.C. § 846 and involve BONZELLE NIMMONS, also known as "Boo," STEVEN SEAFORTH, also known as "Frost," PAUL MITCHELL, MICHAEL HEWITT, and CHANEL GROOM, since January 1, 2017, including:

a. All records and information on the SUBJECT TELEPHONES described in Attachment A, including names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, Internet activity (including browser history, web page logs, and search terms entered by the user), geo-location data, application data, and other electronic media;

b. Evidence of user attribution showing who used or owned the SUBJECT TELEPHONES at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

c. Evidence of software that would allow others to control the SUBJECT TELEPHONES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d. Evidence of the lack of such malicious software;

e. Evidence of the attachment to the SUBJECT TELEPHONES of other storage devices or similar containers for electronic evidence;

f. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT TELEPHONES;

g. Evidence of the times the SUBJECT TELEPHONES were used;

h. Passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT TELEPHONES; and

i. Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**ATTACHMENT C**

AL:MSM
F.#2016R00064

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE SEARCH OF (1)
THE WHITE SAMSUNG MODEL SM-
J700T1 CELLULAR TELEPHONE WITH
SERIAL NUMBER J700T1UVU1APD3
AND IMEI 357217/07/631136/3 ASSIGNED
TELEPHONE NUMBER (716) 370-5962; (2)
THE BLACK SAMSUNG MODEL SM-
G550T CELLULAR TELEPHONE WITH
SERIAL NUMBER RV8HC179V1E AND
IMEI NUMBER 353764/08/407566/6
ASSIGNED TELEPHONE NUMBER (347)
300-1349; (3) THE GOLD APPLE IPHONE
MODEL A1778 ASSIGNED TELEPHONE
NUMBER (347) 552-9091; (4) THE BLACK
AND GRAY ZTE CELLULAR
TELEPHONE WITH IMEI
860550030044708 AND SERIAL NUMBER
329F660408E8 ASSIGNED TELEPHONE
NUMBER (347) 898-2284; AND (5) THE
GOLD SAMSUNG MODEL SM-J320P
WITH HEX 3172308314734, CURRENTLY
IN THE CUSTODY OF THE ATF WITHIN
THE EASTERN DISTRICT OF NEW YORK

APPLICATION FOR A SEARCH
WARRANT FOR ELECTRONIC DEVICES

Case No.

17M 460

---

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, EDWARD J. MARTIN, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—five

electronic devices—that are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been since October 2014. Prior to becoming an ATF Special Agent, I was a Special Agent with the Naval Criminal Investigative Service for over five years. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for narcotics trafficking, robberies, possession of firearms, and firearms trafficking. These investigations are conducted both in an undercover capacity and overt capacity. I have participated in investigations involving search warrants, arrest warrants and court-authorized interceptions of wire and electronic communications.

3.      I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other law enforcement agents; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another agent or law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

2

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      As further described below, on February 26 and 27, 2017, based in part on communications intercepted pursuant to court-authorized wiretaps, law enforcement officers arrested MICHAEL HEWITT, PAUL MITCHELL, BONZELEE NIMMONS, CHANNEL GROOM, and STEVEN SEAFORTH for conspiring to possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 846. On March 28, 2017, the grand jury returned an indictment charging HEWITT, MITCHELL, NIMMONS, GROOM, and SEAFORTH with conspiracy to distribute methamphetamine in violation of Title 21, United States Code, Section 846, and NIMMONS with possession of more than 28 grams of cocaine base with intent to distribute, in violation of Title 21, United States Code, Section 841(b)(1)(B). (See 17 CR 164 (ENV)).

6.      In connection with the February 26 and 27, 2017 arrests, law enforcement officers recovered, among other things, a bag of approximately 298 yellow pills containing methamphetamine, and nine cellular telephones. I make this affidavit in support of an application to search five of the nine cellular telephones seized in connection with the February 26 and 27, 2017 arrests. Those five phones are particularly identified in paragraph 7.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.      The property to be searched is set forth in the following paragraphs:

a.      The White Samsung Model SM-J700T1 cellular telephone with serial number J700T1UVU1APD3 and IMEI 357217/07/631136/3 assigned telephone number (716) 370-5962 (the "HEWITT PHONE"). Law

3

enforcement officers recovered the HEWITT PHONE from inside a gray 2016 Hyundai Sonata (the "Gray Sonata") at the time of HEWITT's arrest. A law enforcement officer called telephone number (716) 370-5962, a number used in intercepted calls set forth in paragraphs 13-23, 31 and 33 below, and the HEWITT PHONE rang.

b.      The black Samsung Model SM-G550T cellular telephone with serial number RV8HC179V1E and IMEI number 353764/08/407566/6 assigned telephone number (347) 300-1349 (the "MITCHELL PHONE"). Law enforcement officers recovered the MITCHELL PHONE from MITCHELL's hand at the time of his arrest. A law enforcement officer called telephone number (347) 300-1349, a number used in intercepted calls set forth in paragraphs 26-27, and 34-37 below, and the MITCHELL PHONE rang.

c.      The gold Apple iPhone Model A1778 assigned telephone number (347) 552-9091 (the "NIMMONS IPHONE"). At the time NIMMONS was arrested, law enforcement officers recovered the NIMMONS IPHONE from the center console cup holder of a red Ford Escape further described below. A law enforcement officer called telephone number (347) 552-9091, the number NIMMONS has previously used in connection with drug trafficking and in intercepted calls described in paragraphs 24-30, 32-37 below, and the NIMMONS IPHONE rang.

d.      The black and gray ZTE cellular telephone with IMEI 860550030044708 and serial number 329F660408E8 assigned telephone number (347) 898-2284, a telephone number used in intercepted communications described in paragraphs 13-25, 28-33, and 42 below (the "SEAFORTH ZTE PHONE"). The SEAFORTH ZTE PHONE was recovered from SEAFORTH at the time of his arrest.

e.      The gold Samsung Model SM-J320P with HEX 35172308314734 (the "GROOM PHONE"). Law enforcement officers recovered the GROOM PHONE from CHANEL GROOM at the time of her arrest.

8.      The HEWITT PHONE, the MITCHELL PHONE, the NIMMONS IPHONE, the SEAFORTH ZTE PHONE, and the GROOM PHONE are collectively referred to herein as the "Devices."

9.      The Devices are currently located in the custody of the ATF within the Eastern District of New York.

4

10.    The applied-for warrant would authorize the forensic examination of the Devices

for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

11.    Since at least February 2016, the United States has been conducting an

investigation into drug trafficking activity in and around the intersection of Regent Place and

Flatbush Avenue in the Flatbush/Ditmas Park section of Brooklyn, New York and elsewhere.

The investigation has involved, among other things, controlled purchases of drugs using a

confidential informant and undercover law enforcement officers and court-authorized wiretaps.

12.    As noted above, law enforcement officers arrested NIMMONS, MITCHELL,

HEWITT, and GROOM on February 26, 2017 and SEAFORTH on February 27, 2017.  As set

forth in greater detail below, the arrests were based, in part, on communications made using the

Devices, that were intercepted pursuant to court order over two of the Devices—the NIMMONS

IPHONE the SEAFORTH ZTE PHONE.

SEAFORTH and HEWITT Arrange and Then Postpone a Drug Transaction

13.    Between February 19, 2017 and February 26, 2017, SEAFORTH, using telephone

number (347) 898-2284, which is assigned to the SEAFORTH ZTE PHONE, and an individual

later identified as MICHAEL HEWITT, who was using telephone number (716) 370-5962, the

number assigned to the HEWITT PHONE, communicated several times to arrange a drug

transaction.

14.    For example, on February 19, 2017 at approximately 11:44 a.m., SEAFORTH

received a call from HEWITT and the following conversation occurred:

| HEWITT: | What's up? |
| SEAFORTH: | Still talking some outrageous price and shit, yo. |

5

| | |
|---|---|
| HEWITT: | Yeah. |
| SEAFORTH: | He is talking about five. I said, "Five?" |
| HEWITT: | Again? Shit, I'll work with it. He can't do four? |
| SEAFORTH: | Sometimes four but he was talking secretly like five and a half, like for who [U/I]. |
| HEWITT: | He said what? |
| SEAFORTH: | That he was talking five and a half. I'm like, "Sorry, he won't pay that, bro." |
| HEWITT: | Damn! |
| SEAFORTH: | He will try talking to him and see. |
| HEWITT: | Yeah. He wanted five but four will be better. |
| SEAFORTH: | I will try and talk to him and see what he says. |

15.    Based on my training and experience, the context of the conversation, and the evidence collected during the investigation, I believe that the above-referenced conversation is in furtherance of a drug-trafficking conspiracy. Specifically, I believe that when SEAFORTH told HEWITT that "he was still talking some outrageous price and shit," he was telling HEWITT that his supplier was still charging a high price for the drugs that SEAFORTH was going to provide to HEWITT and, specifically, that his supplier had talked about charging "five and a half," but that after SEAFORTH told his supplier that HEWITT "won't pay that," he agreed to take "five." HEWITT told SEAFORTH that he could pay "five," but that "four will be better," meaning that he would prefer to pay "four" for the drugs.

16.    Later that day, at 12:35 p.m., SEAFORTH called HEWITT and the following conversation occurred:

| | |
|---|---|
| SEAFORTH: | Yeah, he ain't budging off on that five piece. That's the price he wants |

6

| | |
|---|---|
| HEWITT: | Alright, that'll work. I'll be down there Tuesday. |
| SEAFORTH: | Tuesday? |
| HEWITT: | Yeah. |
| SEAFORTH: | Alright, then I'll let him know. |

17.     Based on my training and experience, the context of the conversation, and the evidence collected during the investigation, I believe that the above-referenced conversation is in furtherance of a drug-trafficking conspiracy.  Specifically, I believe that when SEAFORTH told HEWITT that "he ain't budging off on that five piece.  That's the price he wants," he was indicating to HEWITT that his supplier was sticking with the price of "five" for the drugs that SEAFORTH had previously discussed with HEWITT.  I also believe that when HEWITT responded, "Alright, that'll work.  I'll be down there Tuesday," he was indicating that he would purchase the drugs at the "five" price and that he would travel down to SEAFORTH's location on Tuesday (February 21, 2017) to complete the drug transaction.  The investigation has revealed that SEAFORTH lives in Brooklyn, New York.

18.     Communications intercepted after February 19, 2017 indicated in substance and in part that HEWITT did not complete the drug transaction with SEAFORTH on Tuesday, February 21, 2017 but that they intended to do so in the following days.

19.     Intercepted communications indicate, in substance and in part, that HEWITT sent SEAFORTH $4,100 via a Western Union transaction made by CHANEL GROOM, which, based on my training and experience, the context of the intercepted communications, and the evidence collected during the investigation, I believe is money to be used in the drug transaction that SEAFORTH and HEWITT had been discussing.  Among other communications, at approximately 11:29 a.m. on February 23, 2017, HEWITT sent SEAFORTH the following text

message: "5753795267." Based on my training and experience, the context of the message and other intercepted calls in which that number is mentioned, and the evidence collected during the investigation, I believe that "5753795267" is the tracking number of the Western Union transfer discussed above. According to records obtained from Western Union, on February 23, 2017, "Chanel Groom" sent $4100 to Steven Seaforth with control number "5753795267." According to the Western Union records, the sender's phone number is (716) 553-1242.[1]

### HEWITT Travels to SEAFORTH For The Drug Transaction

20.     On February 25, 2017 at approximately 2:34 p.m., SEAFORTH called HEWITT. During the call, HEWITT said in part, "I'm 'bout to hit the road in a hour" and "I'm 'bout to hit the road in a hour, we gonna talk when I get down there." Later that day, at approximately 6:17 p.m., HEWITT called SEAFORTH and said, in part, "Yo, I'm on the road now" and "I ain't gonna get there 'til late so I'ma get next to you in the morning."

21.     Based on my training and experience, the context of the conversation, and the evidence collected during the investigation, I believe that the above conversations were in furtherance of a drug-trafficking conspiracy. Specifically, I believe that when HEWITT told SEAFORTH that he was "about to hit the road in a hour," he was indicating to SEAFORTH that he was going to travel to SEAFORTH's location to engage in the drug transaction that they had discussed the previous week and that once he started traveling, he informed SEAFORTH of that fact ("I'm on the road now") and scheduled to meet with SEAFORTH to engage in the drug transaction the next morning because of his late arrival time.

---

[1] After her arrest, when GROOM provided her pedigree information to law enforcement officers, she reported that her phone number was (716) 553-1242.

22.     The next day, at approximately 8:49 a.m., HEWITT called SEAFORTH and the

following conversation occurred:

| | |
|---|---|
| HEWITT: | What's, what's the earliest we can knock this out? |
| SEAFORTH: | I have to call them niggas up. |
| HEWITT: | Alright, do that, do that. I'm trying to huh—get this thing out of the way early my nigga. |

23.     Based on my training and experience, the context of the conversation, and the

evidence collected during the investigation, I believe that the above-referenced conversation was

in furtherance of a drug-trafficking conspiracy.  Specifically, I believe that when HEWITT said,

"what's the earliest we can knock this out?," he was asking when the earliest was that he and

SEAFORTH could meet to complete the drug transaction, and that when SEAFORTH replied, "I

have to call them niggas up," he was indicating to HEWITT that he needed to call his drug

supplier to determine when the transaction could occur.

### SEAFORTH Calls NIMMONS to Arrange a Drug Transaction For Hewitt And NIMMONS Calls MITCHELL, His Supplier

24.     On February 26, 2017 at approximately 9:20 a.m., SEAFORTH sent the following

text message from telephone number (347)-898-2284, the number assigned to the SEAFORTH

ZTE PHONE, to telephone number (347) 552-9091, the number assigned to the NIMMONS

IPHONE: "Yo my man down here."  At approximately 10:34 a.m. and 10:35 a.m., NIMMONS

sent the following text messages to SEAFORTH:

| | |
|---|---|
| NIMMONS: | Ight going to church I'll hit u after hitting my boy now |
| NIMMONS: | Same thing 300 bags n 56 hour studio wit Cyrus |

25.     Based on my training and experience, the context of the text messages, and the

evidence collected during the investigation, I believe the above text messages are in furtherance

of a drug-trafficking conspiracy. Specifically, I believe that when SEAFORTH told NIMMONS,

"Yo my man down here," he was indicating to NIMMONS, with whom SEAFORTH had

arranged the drug transaction, that a customer of SEAFORTH's (i.e., HEWITT) had arrived and

that when NIMMONS responded "I'll hit u after hitting my boy now" and "Same thing 300 bags

n 56 hour studio wit Cyrus," he was indicating to SEAFORTH that he would call his supplier

("my boy") and was providing SEAFORTH with the quantity and / or price ("300 bags n 56

hour") for the transaction.

26.     On February 26, 2017 from approximately 10:37 a.m. to 10:38 a.m., NIMMONS,

who used telephone number 347-552-9091, the number assigned to the NIMMONS IPHONE,

and an individual later identified as PAUL MITCHELL, who used telephone number (347) 300-

1349, the number assigned to the MITCHELL PHONE, exchanged the following text messages:

| MITCHELL: | Let me see if I can grab em |
|---|---|
| MITCHELL: | What time? |
| NIMMONS: | I'm gonna hit them now n find out still in pa be back today |

27.     Based on my training and experience, the context of the messages, and the

evidence collected during the investigation, I believe the above messages were in furtherance of

a drug-trafficking conspiracy. Specifically, I believe that when MITCHELL said, "Let me see if

I can grab em" and "What time?" he was telling NIMMONS that he needed to see if he could

acquire drugs and asking at what time the transaction would occur, and that when NIMMONS

replied, "I'm gonna hit them now n find out," he was telling MITCHELL that he would find out

what time his customers would be available to complete the transaction.

28.     On February 26, 2017 at approximately 10:43 a.m., NIMMONS, using the

NIMMONS IPHONE, sent a text message to SEAFORTH on the SEAFORTH ZTE PHONE

10

stating, "He gonna hit me back," which, based on my training and experience, the context of the conversation, and the evidence collected during the investigation, I believe was NIMMONS informing SEAFORTH that MITCHELL would let NIMMONS know whether he could get the drugs SEAFORTH had asked NIMMONS for.

<u>NIMMONS, SEAFORTH, MITCHELL and HEWITT Arrange a Drug Transaction</u>

29.     Later that day, at approximately 2:17 p.m., NIMMONS, using telephone number 347-552-9091, the number assigned to the NIMMONS IPHONE, called SEAFORTH on telephone number (347) 898-2294, the number assigned to the SEAFORTH ZTE PHONE, and the following conversation occurred:

| | |
|---|---|
| NIMMONS: | Yo. |
| SEAFORTH: | Yo, ah, what's good, bro? |
| NIMMONS: | Uhm, I am just waiting on one uhm, clothing line from my peoples in the Bronx. But the studio time is ready- |
| SEAFORTH: | [U/I]. |
| NIMMONS: | In a hour by the time I get around here, by my way. So he will just hit me and let me know. So I told him I don't know what time yet because I am about to go on another, another uhm- |
| SEAFORTH: | Mm-huh. |
| NIMMONS: | You know what I'm saying? So that's what I'm saying, I'll hit you and just see what you want to do. |
| SEAFORTH: | Uhm so then, so then you don't know when the other side going to be ready, huh? |
| NIMMONS: | No because I text him and I told him I was about to get out of church, and he go like, "alright". But the nigga don't hit me back yet but I'm about to touch him now since I got up. |

11

30.     Based on my training and experience, the context of the conversation, and the evidence collected during the investigation, I believe that the above-referenced conversation is in furtherance of a drug-trafficking conspiracy.  Specifically, I believe that when NIMMONS said, "I am just waiting on one uhm, clothing line from my peoples in the Bronx," he was indicating to SEAFORTH, using coded language, that he was waiting to hear about one type of drug ("one, uhm, clothing line") from his supplier ("my peoples") in the Bronx, and that when he said "the studio time is ready," he was indicating that a second type of drug was already ready.  I further believe that the parties discussed not knowing when NIMMONS's supplier would be ready (SEAFORTH: "you don't know when the other side going to be ready, huh?"; NIMMONS: "No because I text him . . . I'm about to touch him now").

31.     At approximately 4:31 p.m., SEAFORTH using telephone number (347) 898-2284, the number assigned to the SEAFORTH ZTE PHONE, called HEWITT, who was using telephone number (716) 370-5962, the number assigned to the HEWITT PHONE, and the following conversation occurred:

| | |
|---|---|
| HEWITT: | Yeah, what was the number with cyrus again? |
| SEAFORTH: | Uh? |
| HEWITT: | What was the number with cyrus again? |
| SEAFORTH: | Hm, is twenty-three, I think he said, twenty-three. |
| HEWITT: | All right.  Yo, I'm meeting this bitch at twin gate 'cause I really want the other joint before I get back. |
| SEAFORTH: | All right, all right, bet, well, let me hit him up, 'cause I called twice, he ain't pick up, let me hit him and see what's going on, man. |

32.     At approximately 4:33 p.m., SEAFORTH, using telephone number (347) 898-2284, the number assigned to SEAFORTH ZTE PHONE, sent a text message to NIMMONS,

who was using telephone number 347-552-9091, the number assigned to the NIMMONS

IPHONE, saying, "Yo hit me[.]"

33.     Based on my training and experience, the context of the conversations, and the

evidence collected during the investigation, I believe that the above-referenced communications

were in furtherance of a drug-trafficking conspiracy. Specifically, I believe that when HEWITT

asked SEAFORTH "what was the number with cyrus again?," he was asking SEAFORTH, using

coded language, how much SEAFORTH's supplier would charge HEWITT for the drug referred

to using code word "cyrus," and when SEAFORTH responded, "is twenty-three, I think he said,

twenty-three," he was providing HEWITT the price that SEAFORTH's supplier would charge

HEWITT. I also believe that when SEAFORTH said, "All right, all right, bet, well, let me hit

him up . . . let me hit him and see what's going on, man," he was indicating to HEWITT that he

would get in touch with his supplier about the drug transaction. I further believe that when

SEAFORTH sent a text message to NIMMONS at 4:33 p.m. saying, "Yo hit me up," he was

contacting his drug supplier just as he had told HEWITT he would do.

34.     Between approximately 5:47 p.m. and approximately 5:48 p.m., NIMMONS,

using telephone number (347) 552-9091, the number assigned to the NIMMONS IPHONE, and

MITCHELL, using telephone number (347) 300-1349, the number assigned to the MITCHELL

PHONE, exchanged the following text messages:

| | |
|---|---|
| MITCHELL: | I can get it for 3 |
| MITCHELL: | but I need the bread upfront |
| NIMMONS: | Ok let me hit my peeps. Oit |
| NIMMONS: | He can't let you bring it |
| MITCHELL: | Na |

13

| NIMMONS: | Ight so I jus hit my boy n see if he take the ride up |
| MITCHELL: | Cool just let me know |
| MITCHELL: | This guy is leaving his house soon so I gotta known asap |

35.     Based on my training and experience, the context of the conversation, and the evidence collected during the investigation, I believe the above-referenced messages were in furtherance of a drug-trafficking conspiracy. Specifically, I believe that when MITCHELL wrote, "I can get it for 3" and "but I need the bread upfront," MITCHELL was providing NIMMONS with a price for the drugs and telling NIMMONS that he needed the money ("bread") before he could do the deal ("upfront"), and that NIMMONS replied by telling MITCHELL that he needed to check with his customers ("Ok let me hit my peeps") and asking if MITCHELL's supplier would let MITCHELL bring the drugs to NIMMONS and NIMMONS's customers on consignment ("He can't let you bring it"), to which MITCHELL replied "Na." I also believe that when NIMMONS said, "Ight so I jus hit my boy n see if he take the ride up," he was informing MITCHELL that he had just contacted his customer to see if he would travel to MITCHELL's location ("take the ride up") to complete the deal. At approximately 5:51 p.m., NIMMONS, using the NIMMONS IPHONE, had sent a text message to SEAFORTH, saying "Jus woke up HE told me he needs the money up front he can't bring it to us." Based on my training and experience, the context of the messages, and the evidence collected during the investigation, I believe that SEAFORTH is the person NIMMONS was referring to when he told MITCHELL "Ight so I jus hit my boy n see if he take the ride up."

36.     At approximately 6:28 p.m., NIMMONS, using telephone number (347) 552-9091, the number assigned to the NIMMONS IPHONE, called MITCHELL, who was using telephone number (347) 300-1349, the number assigned to the MITCHELL PHONE, and, in

14

substance and in part, asked if MITCHELL could bring "it" to the car if NIMMONS went to the Bronx. MITCHELL agreed and asked NIMMONS how much, to which NIMMONS replied 300. At approximately 6:54 p.m., MITCHELL, using telephone number (347) 300-1349, the number assigned to the MITCHELL PHONE, called NIMMONS, on telephone number (347) 552-9091, the number assigned to the NIMMONS IPHONE, and, in substance and in part, said he could make it happen and asked if the "three" was for sure, to which NIMMONS responded that it was for sure.

37.    Based on my training and experience, the context of the conversations, and the evidence collected during the investigation, I believe that when NIMMONS asked MITCHELL if he could bring "it" to the car if NIMMONS went to the Bronx, he was referring to MITCHELL bringing drugs to NIMMONS's car if NIMMONS drove to the Bronx and that they also talked about the price or quantity of the drugs. I further believe that when MITCHELL told NIMMONS that he could make it happen, he was indicating to NIMMONS that he could provide the drugs NIMMONS had asked for, that when he asked if the "three" was for sure, he was asking if the drug deal definitely would occur, and that when NIMMONS responded that it was for sure, he was indicating that the deal for that amount would occur.

38.    On February 26, 2017, law enforcement officers conducted surveillance in the vicinity of 2349 Gleason Avenue, Apt. 2, Bronx, New York, which a law enforcement database showed was an address associated with MITCHELL. At approximately 8:15 p.m., law enforcement officers observed a red Ford Escape with license plate GEZ3752 (the "Red Ford"), in which law enforcement officers have previously observed NIMMONS, arrive at the intersection of Havemeyer Avenue and Haviland Avenue, which is approximately two blocks from 2349 Gleason Avenue. A short while later, law enforcement officers observed the Red

15

Ford stop in the vicinity of 2349 Gleason Avenue and then drive to the intersection of Ellis

Avenue and Havemeyer Avenue, where it stopped.  Shortly thereafter, law enforcement officers

observed a male get into the Red Ford.

39.     Law enforcement officers observed the Red Ford drive onto the Castle Hill

Avenue overpass of the Bruckner Expressway and park.  Law enforcement officers then

observed a gray 2016 Hyundai Sonata (the "Gray Sonata") with Connecticut license plate

number AC67904 stop across Castle Hill Avenue from the Red Ford.  Law enforcement officers

observed NIMMONS leave the Red Ford and enter the Gray Sonata.

40.     Law enforcement officers approached the Red Ford and the Gray Sonata.  Inside

the Gray Sonata, NIMMONS was seated in the rear passenger seat, HEWITT was in the driver's

seat, and GROOM was in the front passenger seat.  NIMMONS, HEWITT and GROOM were

placed under arrest.  Law enforcement officers seized a bag of yellow pills from the front center

console of the Gray Sonata.[2]  Law enforcement officers also observed a large amount of cash on

the floor between HEWITT's feet and found approximately $1,000 in cash in between

NIMMONS's legs.

41.     Law enforcement officers also approached the Red Ford and observed the

individual later identified as MITCHELL in the front passenger seat.  MITCHELL was also

placed under arrest.

---

[2] At the time of the arrests, I believed, based on my training and experience, that the seized pills
were ecstasy.  Since that time, the NYPD laboratory has analyzed some of the pills, which have
tested positive for the presence of methamphetamine.

42.     On February 27, 2017, location information for telephone number (347) 898-2284, the number assigned to the SEAFORTH ZTE PHONE, obtained pursuant to a court order, showed that the SEAFORTH ZTE PHONE was in the vicinity of East 39th Street, between Church Avenue and Snyder Avenue, in Brooklyn, New York.  Law enforcement officers conduced surveillance in that vicinity.  At approximately 12:05 p.m., law enforcement officers observed an individual matching the photograph and description of STEVEN SEAFORTH in the vicinity of the intersection of Church Avenue and East 39th Street in Brooklyn, New York. SEAFORTH was placed under arrest and transported to the ATF offices in Red Hook, New York.  At the time SEAFORTH was in the ATF offices, location data for the SEAFORTH ZTE PHONE revealed that the SEAFORTH ZTE PHONE was in the vicinity of the ATF offices in Red Hook, New York.

43.     Based on my training and experience and the evidence collected during this investigation, I know that individuals involved in joint criminal activity, such as a drug conspiracy, frequently communicate with each other using cellular telephones through voice calls, text messages, and other software applications that allow transmission of messages.  Based upon my training and experience, I also know that members of narcotics conspiracies often save, in their wireless devices or external storage media, such as flash drives or SD cards, contact information and information regarding the expected delivery of the narcotics and sometimes use their personal phones – either by accident or as a matter of convenience – to contact their criminal confederates.  Based upon my training and experience, I also know that members of narcotics conspiracies take photographs of narcotics and narcotics proceeds to be shared with their criminal associates and posted on social media websites.

44.     Here, as set forth above, there is evidence that the NIMMONS IPHONE, the

SEAFORTH ZTE PHONE, the HEWITT PHONE, the MITCHELL PHONE and the GROOM

PHONE, were all used to communicate between members of the drug conspiracy and/or in

furtherance of the drug conspiracy.  There is also probable cause to believe that all the Devices

will contain contact information of members of the drug trafficking conspiracy and photographs

of narcotics and narcotics proceeds.

45.     The Devices are currently in the lawful possession of the ATF.  Therefore, while

the ATF might already have all necessary authority to examine the Devices, I seek this additional

warrant out of an abundance of caution to be certain that an examination of the Devices will

comply with the Fourth Amendment and other applicable laws.

46.     In my training and experience, I know that the Devices have been stored in a

manner in which their contents are, to the extent material to this investigation, in substantially

the same state as they were when the Devices first came into the possession of the ATF.

## TECHNICAL TERMS

47.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

        telephone) is a handheld wireless device used for voice and data communication

        through radio signals.  These telephones send signals through networks of

        transmitter/receivers, enabling communication with other wireless telephones or

        traditional "land line" telephones.  A wireless telephone usually contains a "call

        log," which records the telephone number, date, and time of calls made to and

        from the phone.  In addition to enabling voice communications, wireless

18

telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or

19

miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

48.    Based on my training, experience, and research, I know that the Devices probably have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

49.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

50.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

h.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

i.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

22

j.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

k.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

l.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

51.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

52.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

53.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices described in Attachment A to seek the items

described in Attachment B.

## REQUEST FOR SEALING

54.     It is respectfully requested that this Court issue an order sealing, until further

order of the Court, all papers submitted in support of this application, including the application

and search warrant.  I believe that sealing this document is necessary because the warrant is

relevant to an ongoing investigation into the criminal scheme and not all of the targets have been

arrested at this time.  Based upon my training and experience, I have learned that, online

criminals actively search for criminal affidavits and search warrants via the internet.  Premature

disclosure of the contents of this affidavit and related documents may have a significant and

24

negative impact on the continuing investigation, including by allowing targets to flee from

prosecution, destroy evidence, change patterns of behavior, or endanger witnesses.

Respectfully submitted,

EDWARD J. MARTIN
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me
on May 18, 2017.

HON. VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

The property to be searched is (1) the white Samsung Model SM-J700T1 cellular telephone with serial number J700T1UVU1APD3 and IMEI 357217/07/631136/3 assigned telephone number (716) 370-5962; (2) the black Samsung Model SM-G550T cellular telephone with serial number RV8HC179V1E and IMEI number 353764/08/407566/6 assigned telephone number (347) 300-1349; (3) the gold Apple iPhone Model A1778 assigned telephone number (347) 552-9091; (4) the black and gray ZTE cellular telephone with IMEI 860550030044708 and serial number 329F660408E8 assigned telephone number (347) 898-2284; and (5) the gold Samsung Model SM-J320P with HEX 35172308314734.

The Devices are currently located in the custody of the ATF within the Eastern District of New York.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. § 846 and involve BONZELLE NIMMONS, also known as "Boo," STEVEN SEAFORTH, also known as "Frost," PAUL MITCHELL, MICHAEL HEWITT, and CHANEL GROOM, since February 1, 2017, including:

a. All records and information on the Devices described in Attachment A, including names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, Internet activity (including browser history, web page logs, and search terms entered by the user), geo-location data, application data, and other electronic media;

b. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

c. Evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d. Evidence of the lack of such malicious software;

e. Evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

f. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

g. Evidence of the times the Devices were used;

h. Passwords, encryption keys, and other access devices that may be necessary to access the Devices; and

i. Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| SEE ATTACHMENT A | ) ) ) | **17 M 460** |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before _____June 1, 2017_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for _30_ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of

Date and time issued:   *May 18 2017 @ 4:37 pm*   _____
                                                                        *Judge's signature*

City and state:      Brooklyn, New York        Hon. Viktor V. Pohorelsky        U.S.M.J.
                                                                  *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____                    _____
                                                        *Executing officer's signature*

                                                        _____
                                                        *Printed name and title*

## **ATTACHMENT A**

The property to be searched is (1) the white Samsung Model SM-J700T1 cellular telephone with serial number J700T1UVU1APD3 and IMEI 357217/07/631136/3 assigned telephone number (716) 370-5962; (2) the black Samsung Model SM-G550T cellular telephone with serial number RV8HC179V1E and IMEI number 353764/08/407566/6 assigned telephone number (347) 300-1349; (3) the gold Apple iPhone Model A1778 assigned telephone number (347) 552-9091; (4) the black and gray ZTE cellular telephone with IMEI 860550030044708 and serial number 329F660408E8 assigned telephone number (347) 898-2284; and (5) the gold Samsung Model SM-J320P with HEX 35172308314734.

The Devices are currently located in the custody of the ATF within the Eastern District of New York.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. § 846 and involve BONZELLE NIMMONS, also known as "Boo," STEVEN SEAFORTH, also known as "Frost," PAUL MITCHELL, MICHAEL HEWITT, and CHANEL GROOM, since February 1, 2017, including:

a. All records and information on the Devices described in Attachment A, including names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, Internet activity (including browser history, web page logs, and search terms entered by the user), geo-location data, application data, and other electronic media;

b. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

c. Evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d. Evidence of the lack of such malicious software;

e. Evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

f. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

g. Evidence of the times the Devices were used;

h. Passwords, encryption keys, and other access devices that may be necessary to access the Devices; and

i. Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.